Thomas Kummer, Esq.
*Pro Hac Vice*
2164 Siesta Avenue
Las Vegas, Nevada 89109
Telephone: 1-775-338-3705
Facsimile: 1-509-696-4871
e-mail: reno4829@aol.com
Attorney for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PETER STROJNIK, P.C., an Arizona Professional Corporation; UNKNOWN VICTIMS I-XXX; <br><br> Plaintiffs, <br><br> vs. <br><br> CAN PAY MINING CO., INC. and Arizona Corporation; DAVID AND TERRI FLASHA, Husband and Wife; DT LIVING TRUST DATED JANUARY 16, 2003, David P. Flasha and Terri A. Flasha, co-trustees David Flasha Trustee; ABC persons and entities I-X, <br><br> Defendants. | NO. 05-0637 PHX ROS <br><br> **PLAINTIFF'S CASE MANAGEMENT PLAN** <br><br> (P.A. Roslyn O. Silver) |

1. **NATURE OF THE CASE:** The Complaint was originally brought by three separate Plaintiffs: (1) GITA, LLC; (2) PGM Technologies, Inc.; and (3) Peter Strojnik, P.C. GITA, LLC has settled its claims with Defendants. PGM Technologies has filed a voluntary notice of dismissal. The remaining Plaintiff brings the cause of action against the Defendants as follows: (1) Count 3, Racketeer Influenced and Corrupt Organizations Act (RICO),18 U.S.C. §§ 1961-1968; (2) Count 6, Pattern of Unlawful Activity in Violation of State Statute A.R.S. 13-2314.04; (3) Count 9, Common Law Fraud; (4) Count 12, Misrepresentation; (5) Count 15, Concealment; (6) Count 16, Breach of Contract. At present, Defendants have not yet filed their Answer.

Plaintiffs are victims of Flasha's and Can Pay's frauds, unlawful acts and/or a pattern of unlawful activity. During the times relevant to the allegations of this Verified Complaint, Flasha and Can Pay have held themselves out as having specialized knowledge in the area of mining, ore processing, ore extraction, and treasure location. They have prayed on victims who are motivated by gold and treasure.

Flasha's and Can Pay's common distinguishing characteristics with respect to each of the victims are marked by representations by Flasha and Can Pay that Flasha and Can Pay possess, own and hold specialized technologies and processes for (1) recovering larger amounts of gold and precious metals from existing ore (the "Flasha Process"); and (2) locating gold and silver treasure at a distance both on the ground and underground (the "Flasha Technology").  The representation regarding the specialized technology for the recovery of gold and precious metals is directed toward those victims who already possess ore that they believe may contain precious metals. The representation regarding the specialized technology for the location of treasure is made indiscriminately to any potential victim with money to pay.

Flasha and Can Pay do not own any specialized technologies and processes for (1) recovering larger amounts of gold and precious metals from existing ore; and (2) for locating locate gold and silver treasure at a distance both on the ground and underground. Flasha and Can Pay obtain money and property from victims by means of false or fraudulent pretenses, representations, and/or promises regarding the ownership of and the abilities of the "Flasha Process" and/or the "Flasha Technology".

In circumstances involving the Plaintiff herein and other victims, Flasha's and Can Pay's scheme involves an offer by Flasha and Can Pay to license, transfer or grant the "Flasha Process" or the "Flasha Technology" to a victim in exchange for cash, valuable services, and other property. Flasha and Can Pay use the "Flasha Process" and the "Flasha Technology" to induce victims to purchase from Flasha and Can Pay goods and equipment from Flasha and Can Pay that either (1) the victim does not need; and/or (2) that are sold at inflated prices.

***Distinguishing Characteristics Of The Use Of The "Flasha Process" In Defrauding Flasha's And Can Pay's Victims***

Can Pay and Flasha are and have been during the periods relevant to this Verified Complaint in the business of processing precious metals ore for clients. Can Pay and Flasha hold themselves out to clients as having specialized knowledge in the following areas:

➢ Processing of precious metals ore;

➢ Design and set up of ore processing facilities;

➢ Equipment needed in the processing of precious metals ore.

Can Pay and Flasha initially process a small amount of client ore from its original form to a concentrate, or "precipitant". During the process, Can Pay and Flasha add a chemical compound referred to as "flux". Flux aids in the chemical process to form the precipitant.

Flasha and Can Pay have exclusive access to the flux during its preparation. The preparation of the flux involves the addition of a predetermined amount of silver to the flux to act as a catalyst. In addition to adding the predetermined amount of the silver catalyst to the flux, Flasha and Can Pay add additional silver and other precious metals, including gold and platinum group metals to the flux. The precious metals enriched flux is then added to the ore for processing. The enriched flux is hereinafter referred to as "Spikes Flux"

Once Can Pay and Flasha have processed the ore to form the precipitant, the precipitant is sent to an assayer. The assayer receives the precipitants that contain not only the precious metals from the precious metals ore, but also the precious metals from the Spiked Flux. The assayer then assays the precipitant and issues an assay report.

The assay report discloses the amount of precious metals within the precipitant. The assay does not accurately reflect the contents of the precious metals from the ore itself because the infusion of the Spiked Flux causes the assay report to disclose not only the precious metals from the ore, but also the precious metals from the Spiked Flux. Flasha submits the assay report to the client as proof of the content of precious metals in the client ore.

The client is misled into believing that the client ore contains greater concentrations of the precious metals in the client ore than actually exist. From the assay report, the client can

calculate the amount of the precious metals contained in a ton of ore, and from that, the value of the ore body belonging to the client. If the assay report shows significant enough amounts of precious metals to warrant further processing, the client is encouraged to have Can Pay and Flasha process additional ore.

Can Pay and Flasha relate to the client that the reason for the high concentration of precious metals in client's ore is the use of the "Flasha Process". The true reason for the high assay reports is that the flux used in the processing has been spiked by Flasha and Can Pay.

On the basis of the false assay readings based on the infusion of Spiked Flux, client is encouraged to hire Flasha and Can Pay to process larger amounts of ore. Can Pay and Flasha relate to the client that the processing of a large amount of client ore would require a large amount of silver additive. The client must pay Can Pay and Flasha in advance for the silver additive. With some clients, Flasha also requires a purchase of equipment at prices set by Flasha.

In reliance on Can Pay's and Flasha's representations that the recovery of precious metals from the client ore is caused by the Flasha Process, and by Flasha's and Can Pay's concealment of the use of Spiked Flux to achieve the assay results, a client pays for the silver additive and any additional charges for equipment as required by Can Pay and Flasha. Once the additional moneys have been paid by the client, Can Pay and Flasha process additional ore for the client.

On many occasions the additional ore does not yield the results purportedly achieved by Can Pay and Flasha relative to the initial smaller sample, nor does the processing recover all of the silver additive. As a result of the much smaller yield than that calculated on the basis of the initial assay, the client is economically harmed and damaged in two distinct manners: First, by losing the silver additive to Flasha and Can Pay; and, Second, by wasting the processing fee to Can Pay and Flasha.

Flasha has been heard stating that he can show a high concentrate of precious metals from a pile of cow dung.

When Can Pay's and Flasha's clients confront Can Pay and Flasha regarding the fact that the larger body of ore did not yield the results indicated by the initial assay, nor did it recover

the silver additive, Can Pay and Flasha blame the results on the assayer, the trucker, the refiner and/or the client.

The series of statements made by Flasha and Can Pay in dealings with their victims include, either individually or in the aggregate, the following:

➤ That Flasha is an expert in the field of processing of precious metals ores.

➤ That Flasha is an expert in the design and set up of ore processing facilities.

➤ That Flasha is an expert in equipment needed in the processing of precious metals ore.

➤ That Flasha is the owner of a specialized, highly secret and extremely valuable precious metals recovery process, the "Flasha Process".

➤ That the "Flasha Process" can recover significantly greater yields from ore than other processes used in the industry.

➤ That the "Flasha Process" involves the addition of a silver catalyst to the ore during the processing of the ore.

➤ That the "Flasha Process" utilized the silver catalyst to extract precious metals that other processes could not extract.

➤ That the entire silver catalyst is recoverable in addition to the recovery of the precious metals in the native ore.

During the course of inducing a client to deal with Flasha and Can Pay, Flasha and Can Pay do not relate to a client any of the following:

a. That Flasha and Can pay do not own and are not aware of any specialized, highly secret and extremely valuable precious metals recovery process.

b. That Flasha had developed a scam with respect to Flasha and Can Pay clients whereby:

c. Flasha would solicit owners of ore to hire Flasha and Can Pay for the purposes of processing such ore using the "Flasha Process".

d. Owners of ore would provide Flasha with small amounts of ore for processing from raw material to a leach concentrate referred in the business as "precipitant".

e.  Flasha would spike the precipitant obtained from the initial ore processing with precious metals flux that Flasha himself had enriched with precious metals.

f.  The effect of spiking the flux was to produce precipitants that would show higher concentrates of precious metals than the ore actually contained.

g.  Flasha and Can Pay would have the precipitant assayed. The assay results – false by the addition of the spiked flux – would then be related to the customer.

h.  Sometimes, Flasha and Can Pay would process additional amounts of ore using the same spiking process, until the customer was ready to order Flasha and Can Pay to process a large quantity of ore.

i.  For processing a large quantity of ore, Flasha and Can Pay would demand an up-front payment for the silver catalyst.

j.  The customer would pay for the silver catalyst, Flasha and Can Pay would process the ore, but the ore would not yield the results anticipated by the client.

k.  Flasha and Can Pay would blame the loss of the silver catalyst and the lesser than anticipated results on the transportation company, the refiner, or the assayer.

l.  The fact of the matter, however, was that Flasha's scam was designed to lure the customer into a large contract by Flasha's fraud in spiking the flux, and that Flasha, and not the transportation company or the refiner, stole the silver catalyst.

m.  That Flasha intended to employ the same overall scam on the victim.

n.  That Flasha was of the opinion that he can show a high concentrate of precious metals from a pile of cow dung.

Can Pay's and Flasha's victims who have suffered damage as a result of Can Pay's and Flasha use of the fraudulent "Flasha Process" and/or the fraudulent spiking the initial sample and/or fraudulently removing, stealing and converting the silver additive include, and/or otherwise dealing fraudulently with them are listed herein with the approximate amount of damages claimed:

> ➤ Richard Austin                    $500,000
> ➤ Hank Chamberlain              $987,000
> ➤ Ron Deen                            $40,000

| | | |
|---|---|---|
| ➢ Chris Edwards | | $350,000 |
| ➢ Will Adams | | $Unknown |
| ➢ Doug Brown | Unknown | |
| ➢ Marty Hackman | | $200,000 |
| ➢ David Harris | $1,000,000 | |
| ➢ Russell Jaffe | | Unknown |
| ➢ Cameron McQueen | $300,000 | |
| ➢ Jerry Nobles | | $10,000 |
| ➢ MCC Technology | | $300,000 |
| ➢ Bob "Doc" Holladay | | Unknown |
| ➢ Roger Wagner | | $200,000 |
| ➢ Christian Weber | | $200,000 |
| ➢ Bill West | | Unknown |
| ➢ Wintergreen | | Unknown |
| **TOTAL** | | **4,087,000** |

### *Flasha's And Can Pay's Method Of Praying On Victims Through The Use Of "Flasha Technology"*

Flasha and Can Pay are and have been during the periods relevant to this Verified Complaint in the business of selling information regarding the location of old Spanish treasures. Can Pay and Flasha hold themselves out to clients as having specialized knowledge in the location and recovery of Spanish treasure.

Flasha's and Can Pay's method of selling and/or offering for sale interests in Spanish Treasure treasures involves the following common elements:

a. Flasha and Can Pay initially entice a victim with representations that "Flasha Technology" has the ability to detect gold, silver, and other precious metals at a distance of a mile or more.

b. Flasha and Can Pay entice the victims with representations that "Flasha Technology" can detect gold treasure and other valuable minerals deep within the ground.

c. As confirmation of the truth of the "Flasha Technology", Flasha and Can Pay demonstrate to a victim an apparatus that has been identified as a molecular frequency scanner.

d. Flasha and Can Pay represent to the victim that Flasha and Can Pay own the technology with respect to the use of the molecular frequency scanner in the location of hidden treasure.

e. Can Pay and Flasha represent to the victim that they already know the location of a buried treasure, and all they need is money to excavate it.

f. Flasha and Can Pay require the victim to pay Flasha and Can Pay money in exchange for an interest in the purported treasure.

***Flasha's And Can Pay's Dealings With PGM***

During early and mid 2001, Flasha and Can Pay made representations to one Edmundo Uribe  and others (commonly referred to as "Uribe") that Flasha and Can Pay owned a specialized process for the extraction of precious metals from a precious metals ore, the "Flasha Process". Flasha and Can Pay did not disclose to Uribe and others that "Flasha Process" involved fraudulent use of the Spiked Flux.

In or about March of 2001, Flasha and Can Pay demonstrated the efficiency of the "Flasha Process" to Uribe. The demonstration was made on certain ore commonly referred to as the "Red Mountain Ore". Uribe was present throughout the process of Red Mountain Ore using the "Flasha Process". Uribe was not present during the preparation of the Spiked Flux used by Flasha and Can Pay in the processing of the Red Mountain Ore. The demonstration of the efficiency of the "Flasha Process" in processing slightly less than 10 tons of the Red Mountain Ore resulted in the recovery of a precious metals bar ("doré bar"); slag; and a liquid solution.

The overall recovery values using the "Flasha Process", including the doré bar, the slag and the liquid solution showed the overall value of $7,623.89, or $787 per ton. Flasha and Can Pay affirmed to Uribe that the recovery values for the Red Mountain Ore were $787 per ton. More than 66.67% of the overall value, or in excess of $525 per ton, of the precious metals ostensibly from the Red Mountain Ore, was based on the precious metals contained in

-8-

the liquid solution. The values were confirmed by assay reports. Flasha and Can Pay stated to Uribe that Flasha and Can Pay can achieve the results by the use of the "Flasha Process".

Flasha and Can Pay failed to disclose to Uribe that the "Flasha Method" employed the use of Spiked Flux. Flasha and Can Pay concealed the fact that the "Flasha Method" employed the use of Spiked Flux. Uribe was not aware of the fraudulent use of the Spiked Flux. The results of the Red Mountain Ore were rigged ("Rigged Results")

Uribe and others were justified in believing the false representations of Flasha and Can Pay that resulted in Rigged Results. On the basis of Rigged Results, Uribe and others agreed to incorporate a company named PGM Technologies, Inc. ("PGM")

Based in part upon the false representations by Flasha and Can Pay relative to the "Flasha Process" and the fraudulent use of the Spiked Flux, Flasha and Can Pay were offered a 26.66% interest in PGM. Thereafter, Can Pay and Flasha suggested that PGM purchase various pieces of equipment from Flasha and Can Pay, all in the approximate amount of $200,000.00, for additional processing. PGM, based on the representations by Flasha and Can Pay stated above, paid $200,000 to Flasha and Can Pay for the equipment Flasha and Can Pay claimed was needed for additional processing.

Approximately a year following the processing of the Red Mountain Ore by Flasha and Can Pay, PGM desired to obtain an independent test regarding the Red Mountain Ore from a Canadian assaying company. PGM sent to the independent Canadian assayer (1) the ore sample; (2) the "Flasha Process" protocol and (3) the flux. The flux sent to the Canadian assayer had been prepared by Flasha and Can Pay. Upon receipt of the ore, the protocol and the flux, the independent Canadian assayer assayed the flux and determined that the flux was Spiked Flux.

When confronted with the fact that Flasha and Can Pay sent to the Canadian assayer Spiked Flux, Flasha responded that all that would need to be done was to deduct from the final results the amount of the precious metals that Flasha and Can Pay had spiked in to the flux. Flasha appeared utterly unable to comprehend the severity of his fraud. Thereafter, Uribe and PGM discovered that subsequent to Flasha's and Can Pay's agreements with

PGM, Flasha and Can Pay initiated another deal relative to the Red Mountain Ore. Uribe and PGM learned that:

1. Flasha and Can Pay submitted to a Nevada Limited Liability Company ("Nevada Company") statements that the Red Mountain Ore contained precious metals worth in excess of $19,000 per ton.

2. Flasha and Can Pay made the Red Mountain Ore available to the Nevada Company.

3. Flasha and Can Pay submitted to the Nevada Company assay reports substantiating the $19,000 per ton value.

4. Flasha and Can Pay certified the assay reports indicating that the value of the Red Mountain Ore was in excess of $19,000 per ton.

5. Flasha and Can Pay agreed to take an equity interest in the Nevada Company in exchange for, *inter alia*:

    a. The use of the "Flasha Process" by the Nevada Company;

    b. The Red Mountain Ore contract;

    c. Purchase by the Nevada Company of Flasha and Can Pay equipment;

    d. Purchase by the Nevada Company of certain real estate in the environs of Wikieup, Arizona.

    e. Upon learning these facts, Uribe and PGM alerted the Nevada Company that a fraud may be perpetrated upon them by Flasha and Can Pay.

    f. Upon learning these facts Uribe and PGM realized that they, too, had been defrauded.

    g. At this time, PGM had reason to believe that Flasha and Can Pay were perpetrating a fraud upon PGM.

### Flasha's Deals With GITA

During the months of September and October of 2004 and prior, Flasha made contact with Peter Strojnik ("Strojnik") and Gregory Crane "(Crane"). Flasha made the following statements to Strojnik and Crane:

1. That he owned the "Flasha Technology";

2. That the use of "Flasha Technology" has resulted in the location of buried treasures;

-10-

3. That Flasha has seen with his own eyes the treasure that he has located with the Flasha Technology through a pilot hole leading to the buried treasure;

4. That he had a photograph of the previously found buried treasure;

5. That he is presently aware of another buried treasure that can be found on a piece of property commonly referred to as the "Hawk Rock" property;

6. That he was willing to transfer the rights to the "Flasha Technology" and the information relating to the location of all buried treasure to GITA in return for an interest in GITA and a $10,000.00 payment.

On the basis of these statements and in reliance thereon, Flasha, Strojnik and Crane entered into a Pre-Formation Agreement in anticipation of the formation of a limited liability company. Pursuant to the pre-formation agreement, Flasha, Strojnik and Crane formed GITA, L.L.C. ("GITA") Flasha demanded that his interest in GITA be held by DT Living Trust Dated January 16, 2003, David P. Flasha and Terri A. Flasha, co-trustees, which received a 64.04% membership interest therein.

Flasha contributed to GITA the "Flasha Technology" and the information regarding the location of buried treasure. Flasha demanded, and was paid, $10,000.00 in cash. The $10,000.00 payment to Flasha, and the membership interest extended to DT Living Trust were made on the basis of the following representations:

1. That Flasha owned the "Flasha Technology";

2. That the use of "Flasha Technology" has resulted in the location of buried treasures;

3. That Flasha has seen with his own eyes the treasure that he has located with the Flasha Technology through a pilot hole leading to the buried treasure;

4. That Flasha had a photograph of the previously found buried treasure;

5. That Flasha was presently aware of another buried treasure that can be found on a piece of property commonly referred to as the "Hawk Rock" property;

-11-

GITA agreed to purchase the Hawk Rock property, and Flasha agreed to dig out the "treasure" using the Flasha Technology[1]. Thereafter, Flasha made a request to GITA to pay the sum of $9,050.00 for a ground penetrating radar ostensibly for the use by GITA in the recovery of the Hawk Rock "treasure". GITA authorized Flasha to purchase the ground penetrating radar, and Flasha ostensibly purchased the ground penetrating radar. The ostensible purchase of the ground penetrating radar was authorized on the basis of the statements and representations made by Flasha and Can Pay encapsulated above. GITA was unable to purchase the Hawk Rock property. Therefore, GITA demanded that Flasha return the ostensibly purchased ground penetrating radar to GITA. Despite repeated demands, Flasha refused to provide the ostensibly purchased ground penetrating radar to GITA, and converted it for his own use.

### *Flasha's Sale Of Technology To The Holladay Group*

Following the transfer of the "Flasha Technology" and the information regarding the "buried treasure" to GITA, Flasha entered into another agreement for the transfer of the "Flasha Technology" and the digging out of the Hawk Rock "treasure" with third parties, including one Bob Holladay ("Holladay Group"). Pursuant to Flasha's agreement with the Holladay Group, Flasha agreed to use the "Flasha Technology" for the purpose of locating and retrieving the Hawk Rock treasure on behalf of the Holladay Group. Flasha demanded and received the sum of $10,000 from the Holladay Group, and particularly one Jorth Richardson.

The Holladay Group and Jorth Richardson paid Flasha and Can Pay the sum of $10,000 on the basis of Flasha's representations there was a treasure buried on the Hawk Rock property. In order to keep the existence of the Holladay Group agreement from the knowledge of GITA, Flasha specifically instructed the Holladay Group not to disclose the existence of the Holladay Group agreement to any person. Flasha had no right to enter an

---

[1] Since the filing of the original Complaint, Crane and Flasha dug up the Hawk Rock Property only to find nothing. Flasha left the owner of the property, one David Good, with unpaid bills and potential lawsuits by excavating contractors.

-12-

agreement with the Holladay Group insofar as the "Flasha Technology" and the information regarding the Hawk Rock "treasure" had been previously sold to GITA.

### *GITA Learns Of The Fraud*

In December of 2004, Strojnik learned that Flasha defrauded GITA by selling the Technology and the Hank Rock Treasure to the Holladay Group. Strojnik placed a telephone call to Flasha to confront Flasha about the fraud in the sale of "Flasha Technology" to third parties.

When confronted with the fraud, Flasha responded, "This just goes to show you that you can't trust anybody. I specifically told them [the Holladay Group] that my deal with them was confidential; I just can't believe that they told you about this".
Flasha's response displayed utter lack of concern or appreciation of his own fraud; Flasha's view was that the guilty parties were the people who disclosed the fraud, not the person who perpetrated the fraud.

On December 15, 2004, Strojnik met with Flasha to discuss these and other issues. At the breakfast meeting GITA confronted Flasha about the sale of the GITA property to the Holladay Group. At the meeting, Flasha admitted the fraud to Strojnik. As a result of the discovery of the fraud, Flasha authored and disseminated a fax to the Holladay Group that indicating, in relevant part:

> 1. When this deal [with Holladay Group] was proposed over 5 months ago, there were some very serious constrains and concerns for the security and disclosure of the information about the assets. ...
> I indicated that none of this information was to be disclosed and if it were, I did not want to participate in this transaction because of the potential legal risks involved.
>
>                \*\*\*
>
> 3. Sometime during this period, a person, or persons on your side, openly discussed these items with a third party [GITA] causing great distress in a personal & professional relationship that has now ended due to information provided to him which either was a complete lie, fabrication or mis-representation of facts that did not exist on your part.

Following the payment of $10,000 to Flasha, Strojnik discovered that the "Flasha Technology" was old molecular frequency scanner technology that had been in public domain for decades, and that it did not belong to Flasha.

**Strojnik's Representation Of Flasha And Can Pay**

During the period of August, 2001, to December, 2004, Strojnik represented Flasha and Can Pay in various matters of representation, including civil and criminal litigation matters ("General Representation"). Strojnik charged Flasha for General Representation matters at Strojnik's discount rate of $200.00 per hour. In addition to General Representation, in or about November, 2003, Flasha and Can Pay requested that Strojnik represent them in contract negotiations relative to a large mining and ore processing contract with Wintergreen Metals Investors, LLC, a Nevada Limited Liability Company("Wintergreen") (The engagement with respect to contract negotiations relative to Wintergreen is hereinafter referred to as the "Wintergreen Representation"). The parties agreed that Strojnik would represent Flasha at Strojnik's then regular hourly rate of $300.00 per hour.

**_Future Fees For Equity Interest Proposal_**

Initially, Strojnik charged Flasha and Can Pay for the Wintergreen Representation on hourly basis. However, on or about October 20, 2004, Flasha proposed to Strojnik that Strojnik provide all future legal services relative to the Wintergreen Representation in exchange for a 10% interest in Wintergreen. From this point forward, Strojnik would act as counsel for Wintergreen, and not for Flasha, and Strojnik would not be entitled to any additional hourly fees. As inducement to enter the fees-for-10% interest proposal, Flasha made and affirmed to Strojnik the following representations of fact:

1. That Flasha is an expert in the field of processing of precious metals ores.
2. That Flasha is an expert in the design and set up of ore processing facilities.
3. That Flasha is an expert in equipment needed in the processing of precious metals ore.
4. That Flasha is the owner of a specialized, highly secret and extremely valuable precious metals recovery process, the "Flasha Process".
5. That the "Flasha Process" can recover significantly greater yields from ore than other processes used in the industry.

-14-

6. That Flasha has assigned the "Flasha Process" to Wintergreen, and that if Strojnik were to accept a 10% interest in Wintergreen in lieu of future fees, Strojnik would reap great profits.

7. That Flasha had access to certain gold bearing ore commonly referred as the Red Mountain Ore, which could be purchased by Wintergreen for $200.00 per ton.

8. That applying the Flasha Process the Red Mountain Ore yielded more than $19,000.00 per ton in precious metals to Wintergreen.

9. That Flasha had the Red Mountain Ore assayed by an independent assayer who confirmed Flasha's findings with respect to the amount of precious metals present in each ton of Red Mountain Ore.

10. That Flasha had access to additional ore that would likewise yield very high precious metals yields which Wintergreen could acquire cheaply.

11. That the Flasha Process involved the addition of a silver catalyst to the ore during the processing of the ore.

12. That the Flasha Process utilized the silver catalyst to extract precious metals that other processes could not extract.

13. That the entire silver catalyst is recoverable in addition to the recovery of the precious metals in the native ore.

14. That Flasha owned approximately 350 acres of land North of Wikieup, Arizona that would be perfect for processing the ore located on the property.

15. That there was a processing plant on the property already belonging to U.S. Power Systems, Inc.

16. That Flasha was the assignee of two judgments entered in favor of Red Mountain Mining, Inc. and against U.S. Power Systems, Inc. ("Red Mountain Judgments").

17. That the Red Mountain Judgments could be executed against the U.S. Power Systems, Inc. refining plant.

Strojnik reasonably relied on the present statements and representations and the affirmation of previous statements and representations of fact made by Flasha. In reliance on Flasha's

and Can Pay's statements of fact narrated above, Strojnik accepted a 10% interest in Wintergreen in lieu of future fees incurred in the Wintergreen representation.

At the time Strojnik accepted Flasha's offer to exchange future fees for a 10% interest in Wintergreen, Flasha failed to disclose any of the following: That Flasha did not own and was not aware of any specialized, highly secret and extremely valuable precious metals recovery process; That the Red Mountain Ore would not yield in excess of $19,000.00 of precious metals per ton; That the assay report for the Red Mountain Ore shown to Strojnik as proof of the value of the ore was false; That Flasha's reassurances regarding the value of the Red Mountain Ore were false; That the Red Mountain Ore had been previously processed by Flasha, and that Flasha could only recover $787.00 in precious metals per ton of ore; That Flasha's reassurances regarding the value of the other ore proposed to be made available to Wintergreen were false; That Flasha had developed a scam with respect to Flasha and Can Pay clients whereby; Flasha would solicit owners of ore to hire Flasha for the purposes of processing such ore using the "Flasha Process"; That Owners of ore would provide Flasha with small amounts of ore for processing from raw material to a leach concentrate referred in the business as "precipitant" or "precip" (herein "Precips"); That Flasha would spike the Precips obtained from the initial ore processing with precious metals flux that Flasha himself had enriched with precious metals; That the effect of spiking the flux was to produce Precips that would show higher concentrates of precious metals than the ore actually contained; That Flasha would have the precipitant assayed. The assay results – false by the addition of the spiked flux – would then be related to the customer; That sometimes, Flasha would process additional amounts of ore using the same spiking process, until the customer was ready to order Flasha to process a large quantity of ore; That for processing a large quantity of ore, Flasha demanded an up-front payment for the silver catalyst; That the customer would pay for the silver catalyst, Flasha would process the ore, but the ore would not yield the results anticipated by the client; That Flasha would blame the loss of the silver catalyst and the lesser than anticipated results on the transportation company, the refiner, or the assayer; That the fact of the matter, however, was that Flasha's scam was designed to lure the customer into a large contract by Flasha's fraud in spiking the flux, and that Flasha, and not the

-16-

transportation company or the refiner, stole the silver catalyst; That Flasha intended to employ the same overall scam on Strojnik with the sole distinction that the scam on Strojnik involved a scam for obtaining services instead of money; That Flasha did not own approximately 350 acres of land North of Wikieup, Arizona; That the land North of Wikieup was not suitable for refining because it was appropriately zoned; That Flasha was not the assignee of the Red Mountain Judgment; That the Red Mountain Judgments could not be executed against the processing plant because the land on which the plant stands belongs to JSG, L.L.C., not U.S. Power Systems, Inc.; That the processing plant was not located on any land owned by U.S. Refining Systems, Inc.; That Flasha has been heard stating that he can show a high concentrate of precious metals from a pile of cow dung; That Can Pay's and Flasha's victims ("Victims") who have suffered damage as a result of Can Pay's and Flasha use of the fraudulent "Flasha Process" and/or the fraudulent spiking the initial sample and/or fraudulently removing, stealing and converting the silver additive include, without limitation, the following:

| DEFRAUDED PERSON OR ENTITY | AMOUNT OF FRAUD |
|---|---|
| Bill West | Unknown |
| Cameron McQueen | $300,000 |
| Chris Edwards | $350,000 |
| Christian Weber | $200,000 |
| David Harris | $1,000,000 |
| Doug Brown | Unknown |
| Jerry Nobles | $10,000 |
| Marty Hackman | $200,000 |
| MCC Technologies | $300,000 |
| Richard Austin | $987,000 |
| Robert Holladay | Unknown |
| Roger Wagner | $200,000 |
| Ron Dean | $40,000 |
| Russell Jaffe | Unknown |
| Stanfield Group | Unknown |
| Will Adams | Unknown |
| TOTAL | 4,087,000 |

### *Strojnik's Discovery Of Flasha's And Can Pay's Fraud*

In or about August of 2004, Strojnik heard from third parties that Flasha had been referring to Strojnik as Flasha's "partner". Strojnik immediately wrote a letter to Flasha to advise that Flasha should never again refer to Strojnik as a "partner". Flasha responded to Strojnik that he had not referred to Strojnik as a "partner" and that any reports to the contrary are false. On or about October 20, 2004, the Wintergreen Representation was concluded, and Strojnik became the general counsel for Wintergreen. In December of 2004, Strojnik learned that Flasha committed fraud with respect to GITA, as more fully described above.

Strojnik placed a telephone call to Flasha to confront Flasha about the fraud in the sale of Technology to third parties. On December 15, 2004, Strojnik met with Flasha to discuss these and other issues. At the breakfast meeting Strojnik again confronted Flasha. At the breakfast meeting, Flasha made admissions of fact that contravened his previous representations to Strojnik and others. During the breakfast meeting Strojnik became convinced that Flasha and Can Pay were committing a scam on Strojnik, GITA, Wintergreen, the Holladay Group and others. Strojnik terminated the meeting and withdrew, or filed for withdrawal, from further representation of Flasha and Can Pay from any and all pending General Representation matters.

**2. ELEMENTS OF PROOF NECESSARY FOR EACH COUNT:**

> **Racketeer Influenced and Corrupt Organizations Act (RICO), [18 U.S.C. §§ 1961-1968]:**

      i. A course of illegal conduct with common external organizing principle including the affairs of the entire Can Pay – Flasha enterprise, to wit: Flasha and Can Pay induce the Plaintiffs and others similarly situated into action by promising the recovery of gold or gold treasure that does not exist.

      ii. The illegal acts committed by Can Pay and Flasha with respect to Plaintiffs and others similarly situated are related in that they have the same or similar purposes, results, participants, victims or methods of commission

-18-

and are otherwise interrelated by distinguishing characteristics, to wit:

A. Can Pay's and Flasha's purpose was Plaintiffs and others similarly situated to take action based on a false premise;

B. The result of Can Pay's and Flasha's scam was to obtain money and/or services by false pretenses;

C. The participants were always Can Pay and Flasha;

D. The method of commission of the illegal acts involved the same act of misleading the parties relative to the existence of precious metals either in precious metals ore or as treasure;

E. A portion of the proceeds of the scam were deposited in the name of D T Living Trust.

F. The misconduct committed by Can Pay and Flasha demonstrates a series of related predicates involving the Plaintiffs and others similarly situated extending over a substantial period of time.

G. By its very nature, Flasha's and Can Pay's misconduct projects into the future with a threat of repetition.

H. Can Pay and Flasha devised and intended to devise a scheme or artifice to defraud, or for obtaining money, property and/or services by means of false or fraudulent pretenses, representations, or promises, as more fully described above, and transmitted or caused to be transmitted by means of communication in interstate or foreign commerce, any writings and/or signs and/or signals and/or pictures and/or sounds for the purpose of executing such scheme or artifice.

I. Can Pay and Flasha devised and intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, and used the United States Mail Service in their scheme, including depositing matters or things to be sent or delivered by the Postal Service, and/or deposited and/or caused to be deposited any matter or thing

whatever to be sent or delivered by any private or commercial interstate carrier, and/or took or received therefrom, any such matter or thing, and/or knowingly caused to be delivered by mail or such carrier according to the direction thereon, and/or at the place at which it is directed to be delivered by the person to whom it is addressed.

J. Can Pay's and Flasha's *modus operandi* discloses a course of illegal conduct with common external organizing principle including the affairs of the entire Can Pay – Flasha ore processing enterprise.

K. Flasha and Can Pay committed a scheme and artifice to defraud PGM through the commission of frauds, misrepresentations, omissions, and concealments hereinabove set forth.

L. Plaintiff has been damages to their property and services as a direct and consequential result of Flasha's and Can Pay's commission of the schemes and artifices alleged above.

M. Can Pay's and Flasha's illegal, unlawful and fraudulent conduct is indictable under the provisions of Title 18 of the United States Code as follows:  U.S.C. §18-1341 relating to mail fraud and U.S.C. §18-1343 relating to wire fraud.

➤ **Unlawful Activity in Violation of State Statute [A.R.S. 13-2314.04]:**

i. Can Pay's and Flasha's *modus operandi* as set forth above discloses a course of illegal conduct with common external organizing principle including the affairs of the entire Can Pay – Flasha enterprise, to wit: Flasha And Can Pay induce the Plaintiffs and others similarly situated into action by promising the recovery of gold or gold treasure that does not exist.

ii. The illegal acts committed by Can Pay and Flasha with respect to Plaintiffs and others similarly situated are related in that they have the same or similar purposes, results, participants, victims or methods of commission

-20-

and are otherwise interrelated by distinguishing characteristics, to wit:

    A. Can Pay's and Flasha's purpose was Plaintiffs and others similarly situated to take action based on a false premise;

    B. The result of Can Pay's and Flasha's scam was to obtain money and/or services by false pretenses;

    C. The participants were always Can Pay and Flasha;

    D. The method of commission of the illegal acts involved the same act of misleading the parties relative to the existence of precious metals either in precious metals ore or as treasure;

    E. A portion of the proceeds of the scam were deposited in the name of D T Living Trust.

    F. The misconduct committed by Can Pay and Flasha demonstrates a series of related predicates involving the Plaintiffs and others similarly situated extending over a substantial period of time.

    G. By its very nature, Flasha's and Can Pay's misconduct projects into the future with a threat of repetition.

    H. Can Pay and Flasha devised and intended to devise a scheme or artifice to defraud, or for obtaining money, property and/or services by means of false or fraudulent pretenses, representations, or promises, as more fully described above, and transmitted or caused to be transmitted by means of communication in interstate or foreign commerce, any writings and/or signs and/or signals and/or pictures and/or sounds for the purpose of executing such scheme or artifice.

    I. Can Pay's and Flasha's *modus operandi* discloses a course of illegal conduct with common external organizing principle including the affairs of the entire Can Pay – Flasha ore processing enterprise.

    J. Flasha and Can Pay committed a scheme and artifice to defraud Plaintiff through the commission of frauds, misrepresentations, omissions, and concealments hereinabove set forth.

K. Can Pay's and Flasha's illegal, unlawful and fraudulent conduct is indictable under the provisions of both Title 13 of the Arizona Criminal Code as follows: A.R.S. §13-1801 *et seq.* - Theft;A.R.S. §13-2310 – Fraudulent Schemes And Artifices; A.R.S. §13-2312 – Illegal control of an enterprise; illegally conducting an enterprise.

➤ **Common Law Fraud** [*Nielson v. Flashberg*, 101 Ariz. 335, 419 P.2d 514 (1966); *Pace v. Sagebrush Sales Company*, 114 Ariz. 271, 560 P.2d 789 (1977)]

     i. Statements of material fact as set forth above.

     ii. The statements referenced above were knowingly false when made.

     iii. The statements referenced above were made with the intention that Strojnik rely thereon.

     iv. The statements referenced above were justifiably relied upon by Strojnik.

     v. Strojnik has been damaged by Defendants' misrepresentation of fact in an amount to be proven at the time of trial.

     vi. Defendants' actions were intentional and designed to benefit Defendants with full knowledge that Strojnik would be damaged thereby. Therefore, Strojnik is entitled to an additional award of punitive damages sufficient to deter those in the shoed of Defendants from engaging in like fraudulent conduct.

➤ **Misrepresentation** [*Van Buren v. Pima Community College Dist. Bd.*, 113 Ariz. 85, 546 P.2d 821 (1976)]:

     i. Flasha and Can Pay made and affirmed to Strojnik, either intentionally, negligently or with a knowing disregard for the truth or falsity thereof, the statements of fact as more fully described above.

     ii. The statements referenced above are statements of material fact.

     iii. The statements referenced above were false when made.

     iv. The statements referenced above were made with the intention that Strojnik

rely thereon.

v.  The statements referenced above were justifiably relied upon by Strojnik.

➤  **Concealment** [*King v. O'Rielly Motor Co.*, 16 Ariz. App. 518, 521, 494 P.2d 718, 721 (1972)]:

i.  Defendants Flasha and Can and Flasha made statements of fact to Strojnik as described above.

ii.  Having offered these statements to Strojnik as statements of fact, Defendants had a duty of explaining the facts, circumstances and events that would make the statements made true.

iii.  Flasha and Can Pay failed to disclose to Strojnik that the representations were incomplete and that Flasha and Can Pay had information that would make the representations complete, to wit, as relating to this Count: That there is no specialized "Flasha Process"; that Flasha and Can Pay use Spiked Flux to achieve the results; that Flasha and Can Pay do now own the "Flasha Technology"; and that there is no buried treasure.

iv.  Defendants failed to fulfill their duty of disclosure.

v.  Defendants intentionally concealed the facts of their fraudulent activities from PGM.

vi.  Defendants' breach of duty to correct misrepresentations and their concealment of facts and intentions were made with the intention that Strojnik rely thereon.

vii.  The statements, omissions and concealments referenced above were justifiably relied upon by Strojnik.

viii.  Strojnik has been damaged by Defendants' omissions and concealments of fact in an amount to be proven at the time of trial.

ix.  Defendants' actions were intentional and designed to benefit Defendants with full knowledge that Strojnik would be damaged thereby. Therefore, Strojnik is entitled to an additional award of punitive damages sufficient to

-23-

deter those in the shoed of Defendants from engaging in like fraudulent conduct.

➤ **Breach of Contract.**

    i. Can Pay and Flasha breached their agreement to pay fees owed to Strojnik for General Representation and Wintergreen Representation.

    ii. Strojnik made a demand on Can Pay and Flasha for payment, but Can pay and Flasha refused to pay.

3. **FACTUAL AND LEGAL ISSUES GENUINELY IN DISPUTE:** Defendants have not yet filed their Answer; therefore, the genuineness of the dispute remains unascertainable.

4. **JURISDICTIONAL BASIS OF THE CASE:** The United States District Court of the State of Arizona has jurisdiction over this matter by virtue of U.S.C. 28-1331 (federal question) and 28-1332 (diversity of citizenship).

5. **PARTIES:** All parties have been served; none of the parties have filed Answers.

6. **PARTIES NOT SUBJECT TO COURT'S JURISDICTION:** None.

7. **DISPOSITIVE ISSUES:** This case is not ready for a determination of dispositive issues.

8. **ARBITRATION, MASTER, OR US MAGISTRATE:** The parties have not agreed to arbitration or submission to a Master or US Magistrate.

9. **RELATED CASES:** None.

10. **SUGGESTED CHANGES TO RULE 26(a):** Plaintiff recommends that Defendants will file their answer no later than **February 28, 2006**. The parties do not propose any changes to the timing, form or requirement for disclosures under Fed. R. Civ. P. 26(a); Plaintiff recommends that the Rule 26(a) initial disclosure statements be exchanged on or before **March 31, 2006.**

11. **SUGGESTED CHANGES TO RULES 30, 31, 33**: None.

12. **DISCOVERY AND DEADLINES:** Subject to Court approval, the parties submit the following suggested deadlines:

    (a)        Answer by Defendants: **February 28, 2006**.

    (b)        Rule 26(a) initial disclosure statements: **March 31, 2006**.

(c)      Motions to amend and motions to join additional parties: **May 31, 2006**.

(d)      Disclosure of expert testimony under Fed. R. Civ. P. 26(a)(2)(C): **June 4, 2006.**

(e)      Discovery Completed: **September 18, 2006**.

(f)      Dispositive motions: **December 15, 2006**.

13. **FINAL DATE FOR SUPPLEMENTATION OF DICCOVERY:**  Plaintiff proposes that all discovery be supplemented no later than **January 15, 2007**.

14. **ANTICIPATED PRETRIAL MOTION PRACTICE:** Upon the conclusion of discovery as anticipated hereunder, the parties intend to file dispositive motions on some or all of the issues in the case.

15. **ESTIMATED LENGTH OF TRIAL:** The parties submit that this action will be ready for trial by **April, 2007** and estimate **10** court days for trial.

16. **JURY TRIAL:** Plaintiff has demanded a jury trial in this action.

17. **SETTLEMENT PROSPECTS:** Settlement has been discussed and continues to be discussed.

18. **COMPLEX TRACK:** The parties agree that there are no unusual, difficult, or complex problems or issues which would require this case to be placed on the complex track.

19. **E-MAIL ADDRESSES:** Mr. Thomas Hoidal: thoidal@hoidalandhannah.com; Mr. Thomas Kummer: reno4829@aol.com.

20. **OTHER MATTERS:** Plaintiff anticipate using computer technology to assist in presentations to the jury. The parties are not aware of any additional matters that may aid the Court at this time.

RESPECTFULLY SUBMITTED this 21st day of February, 2006.

**THOMAS KUMMER**

Thomas Kummer
*Pro hac vice*
Attorney for Plaintiff

-25-

**THOMAS M. HOIDAL, P.L.C.**


_____

Thomas M. Hoidal
Attorney for Defendants

1

PROOF OF SERVICE

2

3   The original and one copy of the foregoing
    Filed electronically this 21st day of February, 2006, to:

4

5   The Clerk of the United States District Court
    401 West Washington

6   Phoenix, Arizona 85003

7   And a copy e-mailed this 21st day of February, 2006, to
    Thomas Hoidal, Esq.

8   thoidal@hoidalandhannah.com

9

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25